IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMY WAX,<br><br>**Plaintiff,**<br><br>v.<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,<br><br>**Defendants.** | No. 2:25-cv-00269-TJS |

**PROFESSOR AMY WAX'S REPLY BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

Penn's opposition says nothing new about the merits of this lawsuit. Penn declines to even argue that its sanctions against Professor Wax are consistent with its contractual promises that tenured professors would enjoy "academic freedom" or "freedom of speech." Rather, Penn rests entirely on its motion to dismiss argument that those promises are too "indefinite to create an enforceable obligation" and that Penn's decision to impose "major sanctions" is unreviewable. Penn's confidence is misplaced, as it now admits that "[u]nder Pennsylvania Law, courts review a breach of contract claim involving a university handbook as it would any other private agreement." Opp. 9. Thus, in the absence of a contractual waiver, Professor Wax has the right to seek judicial enforcement of the substantive protections of her employment contract, just like any other private company employee could.

The harm upon which Professor Wax principally relies—the continuing violation of her freedom of speech—has long been recognized as irreparable. It does not matter that Professor Wax's speech protections arise under contract. Courts presume speech suppression is irreparable because of the unique nature of that harm, not because of the legal source of the right. *See Del. States Sportsmen v. Del. Dep't of Safety*, 108 F.4th 194, 204 (3d Cir. 2024). Here, Professor Wax is under "directives" not to engage in "generalizations about groups by race [or] immigration status" just when issues of DEI and immigration are at the forefront of the national conversation. At this critical time, taking away Professor Wax's ability to speak freely on these issues is irreparable harm, especially in light of Professor Wax's age and health. The same is true of barring her from teaching students who wish to learn from her. Conversely, delaying Professor Wax's one-year suspension will not harm Penn because no Penn students are required to take Professor Wax's classes and because Penn has already permitted Professor Wax to teach throughout this near decade-long dispute. The preliminary injunction should issue.

1

**ARGUMENT**

I. **Professor Wax Is Likely to Succeed on the Merits.**

   A. **Professor Wax Is Likely to Succeed on Her Contract Claim.**

      1. *Penn's Explicit Contractual Promises Are Enforceable.*

Penn attacks a strawman by arguing that the First Amendment only applies to state actors. Opp. 8. But it completely ignores the repeated promises of "academic freedom" and "freedom … of speech" contained in its Handbook, which Professor Wax quoted extensively in her Motion to Dismiss Opposition. *See* Dkt. 31, at 7-8. Professor Wax submits that the interpretation of these well-known terms should be "guided" by the First Amendment, among other authoritative sources, as Penn's former president herself has stated. Am. Compl. ¶¶ 99, 127 & n.9.

Rather than offering its own definition of these contractual terms, Penn insists that they mean nothing: they are "mere aspirational language not sufficiently definite to create an enforceable obligation." Opp. 8. This is nonsensical, as the point of procedural protections (which the Handbook provides to faculty like Professor Wax) is to ensure the proper enforcement of substantive rights. Moreover, the notion that academic freedom protections are too indefinite for judicial enforcement will be news to federal judges across the country, who routinely litigate "academic freedom" claims under the First Amendment. *See Kilborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025) (joining four other circuits holding that the First Amendment guarantees "academic freedom" to public university professors). If "academic freedom" protections read into the First Amendment are sufficiently definite to be judicially enforced against a public university, then surely explicit contractual protections of "academic freedom" are sufficiently definite to be judicially enforced against a private university. Indeed, just like procedural "fairness," "academic freedom" is a "well-worn concept" that courts have experience applying. *Doe v. Univ. of the Sciences*, 961 F.3d 203, 212 (3d Cir. 2020) (enforcing procedural "fairness" protection in handbook

2

because "'all provisions in the agreement …. will be given effect'") (quoting *LJL Transp. v. Pilot Air Freight*, 962 A.2d 639, 647-48 (Pa. 2009)).

Penn thinks the mere fact that it is a university shields its employment decisions from judicial review. Opp. 3. That has not been the law in Pennsylvania since 2001, when the supreme court saw no "reason to devise special rules for restricting review" simply because "one of the parties to a dispute is an institution of higher learning." *Murphy v. Duquesne Univ.*, 777 A.2d 418, 428 (Pa. 2001); MTD Opp. 12-14. Rather, like any other private employer wishing to avoid litigating employment matters, Penn would need a contractual waiver. Opp to MTD 12-13. Yet in the twenty-four years since *Murphy*, Penn never obtained such a waiver, presumably because Penn knew that such an action would be deemed an assault on academic freedom.

Far from waiving judicial review, the Handbook states that "the president's decision," upon completion of the disciplinary process, "is final ***within the University***." Handbook § II.E.16.4.I.5 (emphasis added). The phrase "within the university" qualifies "final" so as to preserve the right to challenge the disciplinary decisions outside of the University (i.e., in court). Yet Penn simply wishes the phrase away, misleadingly describing § II.E.16.4.I.5 as stating that a "decision is meant to be final," full stop. Reply in Supp. of MTD, Dkt. 34, at 5. But under well-settled Pennsylvania law, each contractual term "must be given effect." *Doe*, 961 F.3d at 212 (quotations omitted). Penn's failure to address its own contractual phrase "within the university" speaks volumes.[1]

> 2. *Professor Wax Has Shown a Likelihood that Penn Violated Its Contractual Promises of Academic Freedom and Freedom of Speech.*

Professor Wax alleges that her suspension was based on the content of her extramural statements on matters of public concern, namely affirmative action and immigration. MTD Opp.

---

[1] In addition, Professor Wax continues to maintain that she is likely to succeed on her claims for violations of the Handbook's procedural protections. *See* MTD Opp 19-22.

3

14-15. Most notably, she alleges that Penn has been "fixated" on comments Wax made on a podcast, in the context of a debate about affirmative action, noting an apparent racial disparity in law student grades at Penn. Am. Compl. ¶¶ 5, 14. Penn admits it sanctioned Wax for this and other extramural statements. *See* Opp. at 5 (Wax was sanctioned for making "generalizations about groups by race, ethnicity, gender, sexual orientation, and immigration status" and for "publicly speaking about grades by race").

These statements cannot possibly constitute "a Major Infraction of University Behavior Standards," *see* MTD Opp. 17-19, and they are clearly protected by Penn's promises of "academic freedom" and "freedom of speech." Under well-established academic freedom principles, extramural statements enjoy near absolute protection.[2] And the argument that affirmative action harms its intended beneficiaries by leading to worse academic results is a common criticism, advanced by Justice Thomas, among others. *See Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 269 (2023) (Thomas, J., concurring) ("studies suggest that large racial preferences for black and Hispanic applicants have led to a disproportionately large share of those students receiving mediocre or poor grades once they arrive in competitive collegiate environments.") (collecting studies).

---

[2] Penn's Handbook states that "[w]hen speaking or writing as an individual, the teacher should be free from institutional censorship or discipline." Handbook § II.A. This is a clear reference to the near-absolute protection of extramural statements contained in the American Association of University Professors (AAUP)'s canonical statement on tenure protections. *See* AAUP, *Statement of Principles on Academic Freedom and Tenure*, Principle 3 (1940) ("Tenure [protects] freedom of … extramural activities," which requires that, when professors "speak or write as citizens, they should be free from institutional censorship or discipline"); AAUP, *Declaration of Principles on Academic Freedom and Academic Tenure*, General Principle 3 (1915) ("Academic freedom [includes] freedom of extramural utterance and action"); Academic Freedom Alliance, *Statement on Penn's Suspension of Amy Wax* (Sept. 25, 2024), https://academicfreedom.org/afa-statement-on-penns-suspension-of-amy-wax/.

Penn claimed Wax's statements about a racial disparity in grades violated its policy on the "Confidentiality of Student Records." Am. Compl. Ex. 6. at 25 n.19 (citing [Confidentiality of Student Records < University of Pennsylvania](#)). But that policy states that "this policy pertains to personally identifiable information," which includes "the name of the student" or other information that "would allow a reasonable person in the school community … to identify the student with reasonable certainty." *Id.* Wax's comments concerned broad demographic trends. At no point did she identify any student "with reasonable certainty." Moreover, Penn's privacy policy is intended to implement the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), *id.*, which is not violated by disclosing student records "in statistical, summary form," even if they include the "ethnicity of each student." *Ke v. Drexel Univ.*, No. 11-6708, 2014 U.S. Dist. LEXIS 36531, at *17-18 (E.D. Pa. Mar. 20, 2014).

Finally, Penn claims that Professor Wax made "personally demeaning and offensive comments … directly to students and faculty members." Opp. 13. But rather than offer proof of these statements, Penn simply cites its own Hearing Board's report and claims that "Plaintiff does not deny having made any of the referenced statements." Opp. 1 n.1. Professor Wax absolutely denied the accuracy of the testimony before the Hearing Board about statements she allegedly made to certain students and contested the Hearing Board's report as having "credited uncorroborated claims, and omitted key facts and timelines." *Id.* ¶¶ 53, 72. Indeed, the Hearing Board Report did not evaluate *any* of the factual allegations pertaining to alleged offensive personal comments. Am. Compl. ¶ 74. Penn cannot avoid the clear showing that it sanctioned Wax for academic speech by simply pointing to its own unproven claims.

### B. Professor Wax's Discrimination Claims Are Likely to Succeed.

Penn insists that it "must be the case" that Titles VI and VII permit racial double-standards in speech policies because, otherwise, they could not protect students and employees from "racially

5

harassing speech." Opp. 11. Quite the opposite: Titles VI and VII protect all races equally, and police the speech of all races equally. MTD Opp. 22-28; *cf. Schools v. Seattle School District No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.").

Penn seeks to obscure the uneven enforcement of its speech codes by minimizing Professor Norton's statements denying the sexual violence against Jewish women on October 7 and claiming "Young Jews" play victims, Am. Compl. ¶¶ 90-93; Professor Fakhreddine's endorsement of October 7, *id.* ¶¶ 94-97; Professor Almallah chanting "There is only one solution: intifada revolution," *id.* ¶ 98; and faculty member Booth's cartoon of Jewish men drinking blood, *id.* ¶ 100. According to Penn, those "supposedly anti-Semitic comments" were "isolated political statements," whereas Professor Wax's comments were "personally demeaning and offensive" to Penn "students and faculty." Opp. 13.

This is exactly the racial double-standard that Professor Wax is challenging. Wax's statements concerning race or sexual orientation made during extramural debates on affirmative action, gay marriage, and immigration are considered "disparaging statements targeted at specific … groups with which many students identify." Opp. 5 (quoting President Magill's decision). But when a Penn faculty member draws a cartoon depicting Jews as subhuman in a manner reminiscent of 1930s Nazi propaganda, it is not treated as "targeted at specific … groups with which many students identify." Rather, it is a "political statement[] relating to the Israel-Hamas conflict … not Penn students or faculty." Opp. 13.

Penn claims its tolerance of antisemitic speech is irrelevant because it occurred after Penn's proceeding against Professor Wax and involved faculty members outside of the law school. *Id.* But President Magill issued her decision to sanction Wax on August 11, 2023, establishing a

6

precedent that extramural faculty statements that disparage "racial, ethnic, and other groups with which many students identify" violate Penn's speech policy. Opp. 5. Beginning less than two months later, she and her successor refused to apply the same standard to antisemitic speech. And the antisemitic campus speech was not "isolated." Penn permitted the anti-Israel encampments for the entire 2023-24 academic year. Am Comp. ¶¶ 89-90.

## II. A Preliminary Injunction Is Necessary to Prevent Irreparable Harm.

The loss of the right to speak freely, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This rule was not based on the constitutional source of plaintiffs' claims, but on the uniquely irreparable nature of censorship harms. *See id.* at 373 n. 29 (speech suppression is irreparable because "[t]he timeliness of political speech is particularly important"). As the Third Circuit explained, speech suppression is presumed irreparable because "political speech[] can be especially time-sensitive" and courts reasonably "fear communication will be suppressed ... before an adequate determination that it is unprotected." *Del. States Sportsmen*, 108 F.4th at 204 (quotations omitted). Penn's argument that speech suppression cannot be irreparable unless the guarantee is constitutional is simply illogical. The nature of the injury, not the legal source of protection, is what makes speech harms irreparable. *Elrod* is not to the contrary.

The fact that Professor Wax's claims are grounded in contract does not make the harm from suppression of her speech any more reparable. Just like in *Elrod*, Wax's employer threatened her with termination if she engages in disfavored political speech. Wax. Aff. ¶¶ 12-15 (Ex. A). As Wax explains in her affidavit, this threat has chilled her speech in areas of scholarly interest—affirmative action, racial equity, cultural differences, and immigration—at a time when those issues are at the forefront of the national conversation. *Id.* ¶¶ 15-18. Penn is correct that people "continue

7

to invite [Wax] to lecture," but this only underscores the demand for Professor Wax's voice at this moment. It does not mean she can freely express her opinions, nor does it guarantee the same audience for Wax's speech will exist when this litigation ends.

Oddly, Penn asserts that "Provost Jackson's reprimand letter," which explicitly imposes ongoing "directives" governing Wax's future speech, is "not part of her official sanctions" and, therefore, "outside the scope." Opp. 27 n.17. But the reprimand letter explicitly stated that "in accordance with the recommendations of the Hearing Board, I am issuing to you this public letter of reprimand." Am. Compl. Ex. 11, at 67; *see also id.* Ex. 6, at 26 (recommending a "public reprimand, expressed by University leadership"). But even without these explicit speech "directives," the Hearing Board's decision itself is having an ongoing chilling effect on Professor Wax's speech because it creates a new and vague rule prohibiting "inequitably targeted disrespect." Wax. Aff. ¶ 15; Am. Compl. Ex. 6, at 28.

Suspending Professor Wax[3] would likewise cause irreparable harm because it eliminates a vital platform for her speech. *See Kilborn*, 131 F.4th at 559 ("Our case law reflects the public importance of academic speech, even when it is narrowly directed toward students."). Unlike the jobs in the employment cases Penn cites, Opp. 21-22,[4] a tenured professorship at an Ivy League law school is a unique speech platform, which is exactly why Penn is seeking to take it away. Am. Compl. Ex. 4, p. 13 (Charging Letter) (accusing Wax of abusing "the platform you were granted

---

[3] Penn has not defined the terms of Wax's suspension, but its opposition brief indicates it is "a one-year suspension from teaching" akin to a sabbatical. Opp. 20 & Ex. B. While Professor Wax assumes Penn makes this representation in good faith, she notes that Penn has not otherwise promised to refrain from imposing additional penalties that would cause irreparable harm by potentially interfering with Wax's professorial activities. The ambiguity of Wax's "suspension" makes a preliminary injunction even more imperative.

[4] Only one of Penn's employment cases involves a professor and, even there, the plaintiff did not have tenure and did not bring any kind of free speech or academic freedom claims. *See Bagley v. Yale Univ.*, 2014 U.S. Dist. LEXIS 177611, at *1-2 (D. Conn. Dec. 29, 2014).

when you became a professor."). Professor Wax has long used her teaching role to enlighten students and shape legal thought. Wax. Aff. ¶ 23. She believes Ivy League law students lack exposure to conservative ideas. *Id.* ¶¶ 24-26. She gave up lucrative professional opportunities to accept a tenured professorship with Penn, in part to remedy that lack of exposure. In exchange, she understood Penn to have given her a lifetime platform to instruct students unencumbered by censorship. *Id.* ¶¶ 2, 23-29. Professor Wax is seventy-two years old and has been diagnosed with cancer. *Id.* ¶ 2. The harm from missing one of her remaining years of teaching is irreparable.[5]

Finally, barring Professor Wax from teaching will incalculably harm her reputation. Wax Aff. ¶¶ 19-22. Penn's speech "directives" and its imposition of "major sanctions," which *are* shaping public opinion about her, already force her to cede control of her image to Penn. Opp. 22 n.15 (noting press coverage of Penn's "major sanctions"). And executing a suspension strikes at Professor Wax's reputation for excellence in teaching by validating Penn's absurd claim that she "harass[ed]" students and by suggesting that she is a danger to young adults. Wax Aff. ¶ 19-22. The reputational damage is obvious. *See Ralston v. Garabedian*, 676 F. Supp. 3d 325, 362 (E.D. Pa. 2021) (requiring a teacher "not to be alone with students" is "evidence of … reputational harm"); 11A Wright & Miller, *Federal Practice & Proc.* § 2948.1 (3d ed. 2013) ("Injury to reputation … often is … irreparable").

### III.    The Balance of Equities Favors Professor Wax.

Penn has no legitimate interest in ensuring Wax's sanction is executed before judicial review. Penn claims "the integrity of [its] peer-review disciplinary process" is at stake. Opp. 26. But Penn had a quarter-century to protect that process from judicial "interference" by amending

---

[5] Penn blithely suggests that a one-year suspension is not harmful because professors often take sabbaticals. Opp. 3, 20. That is like suggesting that deplatforming a journalist would not cause irreparable harm because the journalist once took time off from publishing stories.

its Handbook. Penn deems it necessary to suspend Wax immediately to protect "access of students to an equal, respectful learning environment." Opp. 26. But no one is proposing that Wax teach mandatory courses next year. She simply wishes to continue to teach upper-level elective classes as she has throughout her entire eight-year dispute with Penn. Allowing Wax to teach would maintain the long-running status quo.

Penn insists that allowing Professor Wax to speak freely and teach students will harm its reputation because "Penn bears the risk that anything [Wax] says can be attributed to [Penn]." Opp. 27. But Professor Wax has regularly made clear that she does not speak for Penn and, given that Penn's "major sanctions" of Wax's speech have received "considerable media attention," Opp. 22, the risk of anyone thinking Wax speaks for Penn is essentially nonexistent.

### IV.  A Preliminary Injunction Is in the Public Interest.

Courts must consider whether a preliminary injunction is in the public interest, including "the possibility of harm to other interested persons from the grant or denial of the injunction." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176-79 (3d Cir. 2017). And "it is generally in the public interest to enforce the terms of private contractual agreements." *Walden Solar PA Jefferson LLC v. Barbieri Land Mgmt. LLC*, No. 25-cv-83, 2025 U.S. Dist. LEXIS 29011, at *6 (W.D. Pa. Feb. 19, 2025) (quotations omitted).  Allowing Penn to execute its sanction against Professor Wax before this Court can judge its legality harms Penn students. Wax Aff. ¶¶ 23-30. Many of Penn's conservative students believe that Professor Wax is the only professor who truly comprehends or shares their views. And students across the spectrum of political beliefs wish to take her classes and benefit from her mentorship. *Id.* Denying the preliminary injunction means denying those students that opportunity.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction should be granted.

Respectfully submitted,

/s/ *Samantha K. Harris*
Samantha K. Harris
PA Bar No. 90268
ALLEN HARRIS PLLC
P.O. Box 673
Narberth, PA 19072
(610) 634-8258
sharris@allenharrislaw.com


Jason B. Torchinsky*
D.C. Bar No. 976033
Kellen S. Dwyer*
D.C. Bar No. 1008151
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
2300 N Street NW,
Suite 643
Washington, D.C. 20037
jtorchinsky@holtzmanvogel.com
kdwyer@holtzmanvogel.com
Phone: (202) 737-8808

Susan Greene*
NY Bar No. 4687349
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
5360 Genesee Street, Suite 203
Buffalo, NY 14026
sgreene@holtzmanvogel.com
Phone: (716) 647-6103

*Attorneys for Plaintiff Professor Amy Wax*

**pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May, 2025, a true and correct copy of the foregoing was electronically filed and is available for viewing and downloading from the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Samantha K. Harris*
Samantha K. Harris
