IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMY WAX,<br><br>               **Plaintiff,**<br><br>   v.<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,<br><br>               **Defendants.** | No. 2:25-cv-00269-TJS |

### DECLARATION OF PROFESSOR AMY WAX
### IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Amy Wax, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

**Background**

1. I am in the Plaintiff in the above-captioned matter and make this declaration in support of Plaintiff's Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify as to them.

2. I hold a B.S. from Yale University, an M.D. from Harvard Medical School, and a J.D. from Columbia Law School. After law school, I served as an Assistant to the Solicitor General, where I argued fifteen cases before the United States Supreme Court. Upon leaving government, I chose to join academia for the opportunity to contribute to academic debate and, most importantly, to help train the next generation of lawyers. My goal was to obtain a tenured position that would guarantee job security and academic freedom. In 1994, I became an associate professor at the University of Virginia School of Law, before becoming a full professor in 1999. Since 2001, I have been a tenured professor at the University of Pennsylvania ("Penn") Carey Law School. In 2006,

1

I was granted a named chair as the Robert Mundheim Professor of Law. I teach courses in Remedies; Conservative Political and Legal Thought; Law, Neuroscience, and Responsibility; and, until 2018, Civil Procedure. I have also in past years taught Labor Law, the Law and Economics of Work and Family, and Social Welfare Law and Policy. I also previously served on the law school's clerkship committee that helped place students in judicial clerkships. I am seventy-two years old and have been diagnosed with breast cancer, which is currently in remission.

## **The Status Quo Ante**

3. During each academic year from 2001 through 2025, I have maintained an active presence at Penn. Other than the limited times I have been on sabbatical, I have taught at least one class at Penn Law School every year.

4. My dispute with Penn dates to 2017, when I co-wrote in essay entitled: "Paying the Price for Breakdown of the Country's Bourgeois Culture," in which we lamented the breakdown of the cultural "script" that "we all were supposed to follow: Get married before you have children and strive to stay married for their sake. Get the education you need for gainful employment, work hard, and avoid idleness." Most controversially, we stated that "All cultures are not equal. Or at least they are not equal in preparing people to be productive in an advanced economy." This caused significant controversy at Penn, and Theodore Ruger, then the dean of Penn Law School, wrote an op-ed equating my op-ed with race-based violence that had just occurred in Charlottesville, Virginia, and stating that "[he] reject[s] emphatically any claim that a single cultural tradition is better than all others."

5. In March 2018, after I publicly noted an apparent racial disparity in law student grades at Penn Law School, Dean Ruger announced that I would no longer be permitted to teach mandatory classes for first year law students. From that date until the present, I have only taught

upper-level elective courses. Even though my dispute with Penn is very well known throughout the law school, second- and third-year law students continue to take my elective classes and routinely give my courses rave reviews.

6.      On January 25, 2022, Dean Ruger announced that he would seek sanctions against me, alleging that "[s]ince at least 2017, and most recently again two weeks ago, Professor Amy Wax has repeatedly made derogatory public statements about the characteristics, attitudes, and abilities of a majority of those who study, teach, and work here."

7.      On March 2, 2022, Dean Ruger filed formal charges against me seeking "Major Sanctions," based largely on my public statements, some of which were over a decade old.

8.      In May 2023, a Faculty Senate Hearing Board convened to hear testimony on the charges against me, and issued a report recommending that I be sanctioned for my academic speech.

9.      On August 11, 2023, on appeal from the Hearing Board's Decision and Report, Penn's then-President Elizabeth Magill issued a decision determining that I should be sanctioned for my academic speech. The sanctions, if permitted to go into effect, would include a one-year suspension.

10.     On September 23, 2024, Penn informed me that "Interim President J. Larry Jameson confirmed and is implementing the final decision" of former President Magill imposing sanctions against me and that my suspension would commence in July 2025 and extend through the 2025-06 academic year.

11.      Until now and presently, I have engaged in the full range of professorial activities, both at UVA Law School and at Penn Carey Law School. And throughout the entire complaint process at Penn, besides being barred from teaching mandatory first-year classes, I have continued

to function as a full tenured professor. Indeed, during the 2024-25 academic year, which was completed this month, I taught a year-long seminar in Conservative Legal and Political Thought and a course in Remedies, and co-taught a seminar in Law, Neuroscience, and Responsibility with a law school colleague. In addition, from joining Penn in 2001 until the present, I have continued to formally and informally advise student organizations and individual students, as detailed below.

12. Accordingly, because I have taught continuously at Penn Law School since 2001, despite many public controversies and disputes with Penn's administration, maintaining my current teaching schedule and professorial role represents the long-standing status quo, and one which my present and prospective students hope and expect me to continue.

**Chilling Effect on Contractual Rights To Free Speech and Academic Freedom**

13. On September 23, 2024, Penn's Provost, John L. Jackson Jr., issued a "public letter of reprimand," which declared that I was receiving "Major Sanctions" for "flagrant and unprofessional conduct" by "making sweeping and derogatory generalizations about groups by race, ethnicity, gender, sexual orientation, and immigration status," and by "publicly speaking about the grades of law students by race." Am. Compl. Ex. 10 at 64-65. The "derogatory generalizations" is a clear reference to the statements that Dean Ruger included in his charges against me, as well as those relied on by the Hearing Board in their report recommending that I be sanctioned. Those alleged statements include remarks I made criticizing affirmative action policies at Penn and elsewhere, expressing sympathy and support for traditional gender roles, stressing the importance of cultural assimilation for immigrant success, and questioning efforts to require states to recognize same-sex marriage. The reference to "publicly speaking about the grades of law students by race" refers to remarks reporting on my observations, well supported by available data,

4

that there is a racial disparity in grades among law students, and my belief that affirmative action policies are a cause for those disparities.

14. Provost Jackson's letter closed by warning me that "[i]t is imperative that you … refrain[] from … targeted disparagement of any individual or group in the University community" and that "[t]hese directives will remain in effect as long as you are a member of the University's standing faculty."

15. I understand Provost Jackson's letter to be a clear threat that, should I make any statements similar to the alleged statements upon which Penn based its charges against me, even if such statements are made off-campus and in the context of an academic discussion and are backed by ample evidence that Penn has failed to show lack support, I could receive an additional sanction up to and including termination. Indeed, the requirement that I refrain from "targeted disparagement" of any "group" is a clear reference to the term "inequitably targeted disrespect" which is a new term that Penn's Hearing Board invented to describe statements unapproved by Penn on issues related to affirmative action, race, gay rights, and immigration.

16. Provost Jackson's "directives" have severely chilled my speech and my ability to pursue my scholarship or to further my career through speaking engagements and participation on panels and in academic conferences because I must engage in significant self-censorship in any such appearances to avoid possible termination. These "directives" exacerbate the chilling effect on my speech from the Hearing Board and President Magill's decisions, both of which I understand to carry an implicit threat that I could face additional sanctions, including termination, if I made more statements similar to the ones upon which those decisions were based.

17. For instance, a significant area of my recent scholarly focus has been on affirmative action and diversity, equity, and inclusion (DEI) policies. For a generation, such policies were the

5

norm in academia and in the legal and political establishment and few, even on the political right, dared to criticize them publicly. Indeed, as an academic at an elite university, I was nearly alone in my willingness openly to criticize affirmative action and DEI policies and to point out their shortcomings and costs. Often, it was difficult even to find forums to debate these issues, and certainly not with honesty and candor. Now, in the wake of *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181 (2023), President Trump's Executive Orders to "ban" DEI, and the Trump administration's actions against universities and law firms that routinely practice affirmative action and DEI, the country is finally taking an honest look at the drawbacks of these policies. Now that these issues are at the top of the current administration's agenda, and organizations including universities are eager for guidance on how to deal with them, political and academic interest in my work on these issues is at an all-time high, and I have a once-in-a-lifetime opportunity to engage publicly on questions I have written and thought about. This opportunity may not last. Just as the national conversation on these issues has shifted dramatically between 2020 and 2024, it may well shift again before this litigation is complete.

18. Yet, because of Provost Jackson's "directives," I cannot engage freely and fully in this critical public discussion. It is difficult to imagine how I could discuss the harms of affirmative action and DEI policies without risking being accused of engaging in "derogatory generalizations about groups by race." For instance, one of the alleged statements that Penn used to justify my suspension was that "black students do not perform as well as white students because they are less well prepared, and they are less well prepared because of affirmative action." Am. Compl. Ex. 6, at 29. This is one of my core criticisms of affirmative action policies (i.e., that they lead to the admission of less qualified students who, in turn, are less likely to succeed) and it largely tracks the views of Justice Thomas, among others. *See Students For Fair Admission*, 600 U.S. at 269

6

(Thomas, J., concurring) ("[S]tudies suggest that large racial preferences for black and Hispanic applicants have led to a disproportionately large share of those students receiving mediocre or poor grades once they arrive in competitive collegiate environments.") (collecting studies). Yet, I will not be able to express similar sentiments without risking further sanctions, including termination, for "making sweeping and derogatory generalizations about groups by race" and "publicly speaking about the grades of law students by race." Indeed, even writing *this very paragraph* requires me to engage in significant self-censorship, in consultation with my attorneys, to minimize the risk that Penn will view my statements as a sanctionable "derogatory generalization."

19.     Similarly, I have spent much of my academic career studying the effects of immigration on culture and group status and advancement and have long been a lone dissenter from the widespread belief in academia that unrestrained migration is an unmitigated good. Yet, after the 2024 election, the United States is rethinking its permissive immigration system. Immigration policy and the legal rights of immigrants are central to the national discussion like never before. This is a moment for me that any academic would relish: a time when one's area of research and scholarly focus is at the forefront of the national conversation and when the current administration is receptive to one's insights and viewpoints. And this moment—in which a new administration is fundamentally rethinking policy on a particular issue—may not last very long. But, unfortunately, I cannot freely participate in the national debate on immigration law and policy without either engaging in significant self-censorship or running the risk that I will be fired for violating Provost Jackson's "directives" to avoid "derogatory generalizations" by "immigration status." Indeed, to pick just one example, many colleges and universities have been critical of the Trump Administration's policy of revoking visas from foreign students who express sympathy for terrorist groups like Hamas. Were I to publicly support the administration's view by arguing that

7

foreign students have fewer free speech protections than American students, or that a foreign student's political and cultural beliefs should influence student visa decisions, or that the United States should suspend the practice of issuing foreign student visas entirely, I believe I would run a significant risk of being accused of violating Provost Jackson's "directives" to avoid "derogatory generalizations" based on "immigration status" and to "refrain[] from … targeted disparagement of any individual or group in the University community." Again, even highlighting this issue in an affidavit required significant self-censorship and consultation with my attorneys to minimize the risk of violating Provost Jackson's directives. It would seem impossible for me to engage in a free-flowing inquiry and debate about these issues on a panel, for instance, without taking a serious risk that Penn would deem one of my comments as violating Provost Jackson's "directives" and would take retaliatory action up to and including my termination.

### Professional and Reputational Damage

20. Requiring me to serve a suspension before my case can be adjudicated will cause irreparable harm to my reputation and career. Unlike many in academia who focus first and foremost on their scholarship and publications, I have also put considerable effort into building my career and reputation as a teacher in the classroom. That is how, in 2015, I became one of few Penn Law professors to receive the Lindback Award for Distinguished Teaching—a University-wide prize that recognizes extraordinary classroom instruction. This award represents Penn's highest teaching honor and is the result of a rigorous review process by the Dean of Students and other University officials, as well as interviews with many students. Even the Hearing Board that recommend my suspension stated that I "clearly demonstrated teaching excellence in the past." Am. Compl. Ex. 6 at 27.

21. My reputation for excellence in teaching will be irreparably damaged if I am suspended from the teaching role I have held for twenty-four years. Charges have been pending against me since 2022 and I have faced criticism and scorn for my public comments since at least 2017. But execution of that suspension sends a message to the Penn community, and throughout academia, that Penn's inflammatory charges against me are meritorious, credible, and true, and that I am unfit to teach or interact with students.

22. For instance, in the 2022 charging document, Dean Ruger accused me of "exploitation, harassment, and discriminatory treatment of students." This charge is false. As an independent investigation commissioned by Ruger himself concluded, "[t]here was certainly no evidence … to suggest that [I] graded minority students differently, denied them access to professional opportunities over which [I] had some modicum of control, or singled them out for special ridicule or disparagement." Report of Dean Rodriguiez at 40-41. The record makes clear that Penn's charges are based on my opinions on academic issues, not on any "exploitation" or "harassment" of students. Nonetheless, the execution of my sanction will validate these absurd and hyperbolic charges and send a false message that I have "exploit[ed]" and "harass[ed]" students and subjected them to "discriminatory treatment" and, therefore cannot be trusted to instruct or interact with them.

23. Having spent my entire career mentoring and supporting my students, it is humiliating for Penn to declare that I cannot be trusted to teach students. The execution of this sanction—before I have had the opportunity to seek judicial review of its legality—will irreparably destroy the reputation for excellence in teaching that I have spent my entire career building.

**Loss of Teaching Post and Damage to Relationships with Students**

24.     From 2001 until the present, I have devoted substantial time and energy to serving as a teacher and a mentor at Penn Law. Indeed, the number one way in which I contribute to and influence the legal and political culture is through my teaching. Many Penn students go on to leadership roles in government, law firms, corporations, and academia. In my thirty-one years as a law professor, I have repeatedly observed how ideas that gain traction among law students soon work their way into judicial opinions, academic discourse, and administrative legal policy.

25.     As one of the few conservative law professors at Penn or indeed anywhere in the elite legal professoriate, my voice is vital, unique, and irreplaceable. I have made it my life's work to ensure that any Penn student who wishes to learn from me and hear my unique perspectives on legal and policy questions has the opportunity to do so. Through my course on Conservative Political and Legal Thought, in particular, I have had the opportunity to help influence the minds of a future generation of leaders who are eager to hear ideas and viewpoints that are unavailable anywhere else in the law school and in elite universities more generally. In this small way, I believe my role as a teacher makes an impact on the larger legal culture.

26.     While I have taught and mentored students of all backgrounds and political affiliations, Penn's more conservative students most frequently take my classes and seek my guidance and advice. At my disciplinary hearing, several of my former students testified that I played a "pastoral" role for conservative students at Penn, who often feel that the majority of the faculty is hostile to their views and career ambitions. One student testified that he turned to me because "there aren't an overwhelming number of conservative faculty members at Penn, and certainly not an overwhelming number who are vocal or willing to associate with an organization like the Federalist Society." Another stated I was "undoubtedly and probably still is the go-to

conservative faculty member." Another stated I was "a refuge and … provided a safe space for a lot of [Federalist Society] members to discuss ideas" and "totally played a pastoral role." Another stated that I am "a resource for conservatives dealing with a harsh environment." And yet another stated I "was a mentor and just someone who would listen, a huge source of relief if you were a conservative at Penn Law or a libertarian, too."

27. My work in this area has continued to the present day. During the 2024-25 academic year, for instance, the co-Presidents of the Penn Law Student chapter of the Federalist Society asked me to lead a lunchtime series of ten reading-group seminars on Fusionism and Classical Liberalism during the spring 2025 semester. These seminars were part of a pilot program at select law schools, including Penn, launched by the National Federalist Society for the purpose of fostering greater understanding and more open discussion of conservative principles and positions among law students. In requesting my participation, the Penn chapter co-presidents informed me that, based on their conversations with other students at the law school including those who had taken my classes, they had decided that I was the only professor equipped to lead such a group, and the only one they believed capable of presenting the issues in an informed and even-handed way. I consented to participate in the reading group, which was regularly attended by 25-30 law students. The sessions were highly successful and led to engaging and lively discussions of many legal and topical questions.

28. Within the last academic year, several students have asked me whether I will be teaching next year and whether I will be available to meet and socialize with them (as I regularly do over meals and drinks, often at my own expense), as well as to provide academic and career advice. In addition to asking whether I would teach next year, students have inquired whether I would be able to direct the Federalist Society-sponsored reading group described above. In

addition, because of my track record of serving as an advisor and recommender to conservative Penn students seeking clerkships and my important and successful role in helping students obtain positions with Trump-appointed judges with whom the law school has weak to non-existent connections, a number of Penn students have expressed concern that they will not be able to benefit from my guidance through the clerkship process. The students who queried me – which included those enrolled in my classes and those planning to enroll in the future – have also expressed fears that I will not be available to assist them, through my unique contacts and otherwise, in finding positions at conservative think tanks and legal advocacy groups and other right-leaning organizations.

29.    Another consistent theme of my discussions with students was that, due to the one-sided and highly partisan atmosphere at Penn Law School, I am the "only professor" with whom they feel comfortable talking candidly about current political controversies and issues surrounding the Trump administration. And I am certainly the only professor whom many students would feel comfortable asking for a recommendation or assistance with getting a job in the Trump Administration. Indeed, in just the past week I provided extensive assistance to a student who succeeded in her quest to obtain a summer speech-writing internship at the White House.

30.    Suspending me from teaching for a year will remove the most important platform I have to communicate my views to the public and the next generation. And, even though I am not technically barred from mentoring students, mentor relationships do not just happen or grow out of thin air. Most of my most meaningful mentorships and student relationships, current and ongoing, have been with students who have enrolled in my classes.

31.    In addition, a number of students have communicated to me their concern that my being officially sanctioned for my opinions and my speech, which signals the school's disapproval

12

of my ideas, is having a negative and chilling effect on their ability and willingness to speak up in their classes and in their interactions with professors and fellow students at the law school. Students have also repeatedly told me that my threatened suspension, which makes my courses and my teaching unavailable to them, sends a distinct and strong message that dissident and conservative perspectives like mine are unwelcome and will not be tolerated. Execution of my suspension will result in the chilling of my students' speech, in addition to my own. It will make students less willing to associate with and seek my mentorship, to openly associate with other students who have taken my classes, and to pursue their interest in conservative ideas, let alone to express those ideas. All those consequences will have a negative effect on the students, on the quality of their education, and on the atmosphere at the law school itself. It will undermine the school's core, vital mission of preparing students to function in a legal adversary system, and a democratic society more broadly, in which they must deal professionally and civilly with others who do not share their positions and perspectives on important issues. Punishing me and suspending me is at odds with that mission.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 5/26/2025        Signed: *Amy Wax*

                                                                                          Professor Amy Wax